UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | No. 1:21-cr-52-1 (TJK) |
| v. | : | |
| | : | |
| | : | |
| MATTHEW GREENE, | : | |
| | : | |
| Defendant. | : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO REVOKE DETENTION ORDER

On January 6, 2021, the defendant, Matthew Greene conspired with others, including his codefendants Dominic Pezzola and William Pepe, to obstruct Congress' certification of the Electoral College vote and to obstruct law enforcement during the course of a civil disorder. After the riot, the defendant engaged in conversations encrypted messaging platforms admitting to his role in the riot, encouraging others not to give up in a fight to take back their country, and comparing the situation as it existed in the weeks following January 6 to a fourth-generation war. As explained below, the charges against Greene give rise to a rebuttable presumption in favor of detention. Under these circumstances, Magistrate Judge Miroslav Lovric correctly found, there are no conditions or combinations of conditions that will reasonably assure the safety of any other person or of the community.

**Procedural Background**

On April 16, 2021, the grand jury returned an indictment charging the defendant with violations of 18 U.S.C. §§ 371, 231(a)(3), 1361, 1512(c)(2), and 1752(a)(1), (2), and (4). The defendant arrested in the Northern District of New York on April 22, 2021, and he appeared before Magistrate Lovric in that district on that same date. The government moved for the defendant's

detention pending trial, and Magistrate Lovric held a hearing on that request on April 26, 2021.

After that hearing, at which he listened to presentations by both sides, Magistrate Lovric granted

the government's motion for detention and ordered the defendant detained pending trial.

The defendant filed this motion seeking review of Magistrate Lovric's decision on June

15, 2021.  For the reasons stated below, and any that may be cited at a hearing on the motion, the

defendant's motion should be denied.

### Factual Background[1]

On January 5, 2021, Greene traveled from Syracuse, New York, to Washington, D.C.,

along with other Proud Boys from New York State,[2] including codefendant Pezzola.  On January

6, 2021, Greene was one of the first people who traversed past toppled police barricades at First

Street NW; one of the first who continued past another set of breached barricades near the entrance

to a plaza on the west side of the Capitol building; and one of the first up a set of stairs, following

a breach of police defenses on those stairs, leading from that plaza to a higher level of the Capitol

grounds.  He was at the front of the line of rioters when police started using crowd-control

measures, which included pepper spray.  Video evidence shows that Greene then retreated towards

---

[1]    The government proffers and incorporates the factual proffer made before Magistrate
Lovric from the initial detention hearing.  A transcript of that hearing was attached to the
defendant's motion as Exhibit 1.  Copies of the photographs admitted at that hearing are attached
to this motion as Exhibit 1.

[2]    Proud Boys is a nationalist organization with multiple U.S. chapters and potential activity
in other Western countries. The group describes itself as a "pro-Western fraternal organization for
men who refuse to apologize for creating the modern world; aka Western Chauvinists."  Proud
Boys members routinely attend rallies, protests, and other First Amendment-protected events,
where certain of its members sometimes engage in acts of violence against individuals whom they
perceive as threats to their values.  The group has an initiation process for new members, which
includes the taking of an "oath." Proud Boys members often wear the colors yellow and black, as
well as other apparel adorned with Proud Boys-related logos and emblems.

the west plaza at that point; the government has no video or photographic evidence that Greene entered the Capitol on January 6, 2021.

Following the riot at the Capitol, and after his return home to Syracuse, Greene admitted his participation to an acquaintance, telling that person, "I'm good, *we* took the capital" (emphasis added).  He told another acquaintance in the days following the riot to be prepared to do uncomfortable things.  He ordered over 2,000 rounds of assault-rifle ammunition and a gas mask.  And he engaged in conversations with other Proud Boys on encrypted messaging platforms in which he stated a continuing desire to "take back our country" – in Greene's own words, written in chat platforms post-January 6, "this is a 4th generation" war, and "we must stand together now or end up in the gulag separately."

<u>Greene's Actions on January 6</u>

Greene played a substantial role in the breach of the Capitol.  Greene marched with other Proud Boys from the Washington Monument to the Capitol, before then-President Trump's speech from the Ellipse.  He was present near the northwest pedestrian entrance to the Capitol grounds with hundreds of people, including numerous members of the Proud Boys, while the speech was still ongoing.  He, like co-defendant Pezzola and many other Proud Boys on January 6, wore an earpiece connected to a handheld radio, likely of the Baofeng brand, and dressed "incognito"— not wearing the Proud Boys' traditional black and yellow—consistent with the instructions of Proud Boys leadership.

At around 1:00 p.m. EST, on January 6, 2021, known and unknown individuals broke through the police lines near the northwest entrance, toppled the outside barricades protecting the U.S. Capitol, and pushed past U.S. Capitol Police ("USCP") and supporting law enforcement officers there to protect the U.S. Capitol.  After overwhelming USCP officers at the pedestrian

gate, the crowd advanced on the U.S. Capitol, where another line of USCP officers and barricades attempted to stop the crowd from advancing to the walls of the building and the west-facing plaza.

Among the first to traverse the toppled barricades and advance towards the building (and the west plaza of the Capitol) was Greene, shown in a screenshot from a video below, depicted from behind in a tan backpack, blue hoodie, and tan pants. In the video from which this is taken, Greene is running.



Upon arriving at the next barrier, Pepe—Greene's co-conspirator—dragged a segment of the fence away, shown circled below and depicted wearing a flag bandana, which left USCP officers temporarily without any barrier. Others acted similarly with other barriers.



Pezzola and Greene were among the first to reach the next police line, where members of the crowd physically stormed barriers and fought with police. By the time this happened, Greene and Pezzola were next to each other, as circled below, where they would essentially remain for much of the next hour.



The crowd, including Greene, then advanced to the front of the U.S. Capitol. Additional people continued to arrive until what the FBI estimates to be thousands of people had gathered in front of

the Capitol on its west side.  Greene positioned himself near the front of the group with Pezzola, within approximately ten feet of a line of USCP officers, some of whom were in riot gear.  The top photo below is a zoomed-out photo showing the crowd gathered in the plaza, and the bottom is a zoomed-in and cropped version of the same photograph, showing the defendant circled in blue.





Shortly after the above photograph was taken, Pezzola robbed a USCP officer of his riot shield.[3]   Following the robbery, Pezzola and Greene moved through the crowd together, with Greene tailing Pezzola while he was in possession of the shield.  The photograph below is a still shot from a video that depicts Pezzola's robbery of the shield, and the still is within a minute of the robbery.  Pezzola is circled in red and Greene is circled in blue, appearing to be pressing on his earpiece.  *See also* Ex. 1 to this motion, Hr'g Ex. 14-15 for photographs of Greene and Pezzola near each other while Pezzola is holding the shield.  In Hr'g Ex. 14, they appear to be having a conversation.



Greene and Pezzola continued to move together through the crowd, away from the site of the robbery and towards a set of stairs that leads from the plaza they were on to the façade of the Capitol building itself.  A publicly available video taken from this plaza also shows Pezzola and another charged individual, Charles Donohoe, jointly carrying the riot shield, with Greene trailing

---

[3]      Greene is not charged with that robbery.  The robbery occurred during a clash between protesters and police that involved violence and the use of pepper spray.  Video footage captures Greene giving aid to a fellow rioter who was struck by a police projectile prior to the robbery. While defense is correct that the incident is captured on video, it is incorrect about the type of video—it was not captured on body-worn camera to undersigned counsel's knowledge.

close behind.  When someone asked the group whether they stolen the riot shield, a member of the group responded, "yeah."

Shortly thereafter, at approximately 1:48 p.m., according to a video posted originally to the social media site Parler, and later to the open Internet by *Pro Publica*,[4] a group of individuals overran a group of USCP officers on stairs that go from the West Plaza to the Capitol balcony area one story level up.  Pezzola and Greene were among the first rioters to head up the staircase after that breach.  A screenshot from that video is below, with Pezzola circled in red and Greene in blue.  On the stairs, Greene lent his body to the effort of the multitude of rioters pushing up the stairs despite the police's efforts to stop them.



---

[4]      Parler was taken offline in the aftermath of the January 6 riots.  According to its website, *Pro Publica* combed through archives of public Parler videos, and it posted over 500 videos of the events of January 6, 2021.  The entire catalogue of videos posted *Pro Publica* is available here: https://projects.propublica.org/parler-capitol-videos/.

Minutes after this screenshot, rioters can again be seen overwhelming the police defenses at an interior doorway under the scaffolding and pushing further up the stairs.  Police and rioters both began deploying pepper spray as well.  According to other publicly available video, it appears that Greene retreated to the lower west plaza sometime around this point.  Pezzola continued up the stairs and eventually to the Capitol proper, where he broke a window on the Capitol with the stolen shield, allowing rioters to physically breach the Capitol building itself.  Greene is charged with that destruction of property under a vicarious-liability theory. The government's investigation to date has not uncovered video or photographic evidence that Greene entered the Capitol building.

<u>Greene's Actions After the Riot</u>

After the riot, Greene proudly admitted to others that he was present and participated.  On January 6, 2021, at 6:07 p.m., the defendant missed an audio call over the encrypted messaging platform Signal from an acquaintance.  Minutes later, the contact who had just called messaged the defendant on Signal and asked if he was OK.  Greene responded at 6:24 p.m., "I'm good, we took the capital."  After Greene reported that someone was killed inside the building, the acquaintance said that was sad.  Greene replied, "I told you this was coming brother."

The FBI also spoke to a witness, referred to as W-1 for purposes of this memorandum.  W-1 stated that Greene was one of a group of individuals who told W-1 about what they did on January 6.  According to W-1, members of this group said that anyone they got their hands on they would have killed, including Nancy Pelosi.[5]  W-1 further stated that members of this group, which included Greene, said that they would have killed [Vice President] Mike Pence if given the chance.

---

[5]   Unless otherwise noted, the government does not represent that it can attribute statements recounted in this paragraph to Greene (or anyone else in the group) specifically.

According to W-1, the group said it would be returning on the "20th," which in context likely referred to the Presidential Inauguration, which took place on January 20, 2021.  At the time of the interview with W-1, the inauguration had not yet occurred.  W-1 stated that the group said that they planned to kill every single "m-fer" they can.[6]  W-1 stated the men said they all had firearms or access to firearms.  W-1 specifically recounted that Greene said words to the effect of "we'll kill them all," and that they had stockpiles of guns and ammunition.  W-1 also stated that Greene advised co-defendant Pepe to get rid of some 30-round magazines Pepe stated that he kept at his home.

On January 8, 2021, in a different Signal chat, a contact asked whether Greene was back "up north."  The defendant replied, "I'm back home now.  Regroup and refit."  That conversation continued January 10, with the contact asking whether the President had signed the Insurrection Act.[7]  Greene speculated that if it had in fact been signed, "He [the President] will tell us somehow."  The acquaintance reported to Greene that he was "battoning [sic] down the hatches and loading magazines right now."  Greene said he was doing the same thing.  He continued, "[w]e had a fucking rat in our ranks," and encouraged the acquaintance to study guerrilla warfare tactics based on their time in Afghanistan and to "[b]e prepared to do uncomfortable things" before sending multiple images that appear to reference the death of Ashli Babbit, the rioter who was shot

---

[6]     In a later interview, W-1 stated that the group had no definitive date for a return to Washington, D.C, but W-1 re-iterated that the others agreed there would be guns and that they would be back soon and they would bring guns.

[7]     The Insurrection Act, 10 U.S.C. § 251, *et. seq.*, was passed in 1807 and permits the President to call into service "the militia of any state" and "the armed forces" whenever the President "considers that unlawful obstructions, combinations, or assemblages, or rebellion against the United States, make it impractical to enforce" federal law.

and killed inside the Capitol on January 6.  He concluded, following those images, "Don't forget what they did," before apparently attempting to make the message self-destruct in an hour.[8]

On January 13, 2021, in a chat room on the encrypted messaging platform Telegram for the Central New York Proud Boys, Greene responded to another member's concern the country would collapse under the hand of corporations and a corrupt government, among other things, by stating, "You know how I feel about this.  We will take back our country, our parents left us a shit show but we will not do the same to our children."  When the member who sent the original comment said his children were two of the biggest reasons he had for "not giving up and not rolling over," Greene responded with the following.[9]



_____

[8]     These and all other descriptions of encrypted conversations involving Mr. Greene were recovered from a phone recovered from Mr. Greene's residence on January 18, 2021.

[9]     In the Telegram screenshots, Greene's statements are in blue bubbles.  At this point, according to Greene's statement to the FBI, his Telegram display name was "Thomas Paine."

Greene also advised the Central New York Proud Boys on Telegram about what to do if they think they are being followed by the FBI, noting on January 15, 2021, "If you think you are being followed, route planning is the best counter surveillance technique.  Look to incorporate natural double backs, the goal isn't necessarily to lose them but to detect them.  But fbi surveillance is no joke, they are good."

On January 17, 2021, again with members of the Central New York Proud Boys chat room, Greene stated, "the sooner everyone wakes up that no one is going to fix this mess besides us, the sooner we can collectively take back our country."  In Greene's words, "this is a 4th generation" war, and "we must stand together now or end up in the gulag separately."  He posted in the same thread on that date, "I see way too many people trying to say antifa was responsible for the capital, its bullshit too.  They weren't there, can't take a damn win and admit it people are pissed off."

On January 18, 2021, the day after he posted these messages, the FBI executed a search warrant at the defendant's residence, and he agreed to a voluntary interview with agents.  During that interview, the defendant claimed (among other things) that he was disavowing the Proud Boys and that things on January 6 had gone too far for him.  He also claimed not to have seen anyone he drove down with from Syracuse after he made it to the Capitol, nor to have seen any of the

people he traveled with holding any USCP riot gear (which is belied by the evidence that he was with Pezzola above), and to not really know any of the people he drove down with, including their names or nicknames (although he eventually said that he knew of Pezzola as "Mick.")[10]  He did not use the name "Spaz" or "Spazzo" to describe Pezzola during this interview.

Contrary to Greene's statements to the FBI, information recovered from his phone provides evidence of his knowledge of and connection to Pezzola, as well as knowledge of Pezzola's nickname.  On or about January 12, 2021, in response to another member of the chat posting a link to an article in *Vice News* that identified the person who broke the window as a Proud Boy who goes by "Spazzo," but that did not include Pezzola's true name, Greene stated, "Spaz practiced pretty good opsec at least, they don't have much on him."  When the affidavit in support of a complaint for Pezzola became public on January 15, 2021, another member of the Telegram chat posted a portion of it that referenced W-1.  Greene speculated as to which "normie" was hanging around at the hotel who may be W-1, and Greene also asked, "Who did Spaz give his number to?"  The FBI also recovered a photograph of a group of Proud Boys, apparently taken inside a bar, which metadata indicates was taken in December 2020, that includes both Greene and Pezzola.

On January 18, 2021, when the FBI executed a search warrant at the defendant's residence, they located an unregistered AR-15 assault rifle capable of working with detachable magazines that also had long-range optical capability and a tactical lighting device (Hr'g Ex. 1), along with

---

[10]     To his credit, in that interview, the defendant did admit to entering the Capitol grounds and going up the stairs under the Inauguration stage scaffolding on January 6.  He also admitted to traveling to Washington, D.C. from Syracuse and told the FBI where he stayed and with whom.

two unregistered semiautomatic handguns (Hr'g Ex. 8-9) and a rifle (Hr'g Ex. 6-7).[11]  One of those handguns was found in a secret compartment of a drop-down shelf capable of being opened only with a card key device (Hr'g Ex. 9).  The FBI also located a camouflage tactical vest filled with eight detachable magazines for an AR-15 (Hr'g Ex. 2-4).  Each of the eight magazines with loaded with 30 rounds of AR-15 ammunition.  Although undersigned counsel does not practice law in the state of New York, I have been informed by a New York State Police officer, who is cross-designated to the FBI's Joint Terrorism Task Force and participated in the search, that Greene's possession of the AR-15 and the detachable magazines was illegal under New York state law.

FBI's review of the defendant's Gmail account as contained on his personal phone that was seized in connection with the January 18 search warrant, revealed that the defendant placed the following orders, among others: (1) six AR-15 magazines, ordered on December 20, 2020 Hr'g Ex. 10); (2) 1,000 rounds of AR-15 ammunition on January 9, 2021 (Hr'g Ex. 11-12); (3) 1,560 rounds of AK-47 ammunition on January 9, 2021 (Hr'g Ex. 13); and (4) a gas mask kit on January 11, 2021 (Hr'g Ex. 15).

## Principles Governing Requests for Detention

Under the Bail Reform Act, courts consider the following factors in determining whether some condition, or combination of conditions, will reasonably assure community safety or the defendant's appearance at trial and pre-trial proceedings:  the nature and circumstances of the charged offenses; the weight of the evidence against the defendant; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or to the community

---

[11]     References to hearing exhibits are to those that were entered at the detention hearing in the Northern District of New York.  A copy of all those exhibits is attached here to as Exhibit 1 to this Memorandum in Opposition.

that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *see United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (D.D.C. 2014); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 & n.1 (D.D.C. 2013).  A magistrate judge's determination regarding bail is reviewed de novo.  *See*, *e.g., United States v. Hudspeth*, 143 F. Supp. 2d 32, 35-36 (D.D.C. 2001).

At a detention hearing, the government may present evidence by way of a proffer.   *See United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996); *United States v. Roberson*, No. 15-cr-121, 2015 WL 6673834, at *1 (D.D.C. Oct. 30, 2015).   A judicial determination that a defendant should be detained pending trial on the ground of community safety must be supported by clear and convincing evidence. *Smith*, 79 F.3d at 1209.    When the government seeks to detain a defendant on the ground that the defendant is a risk of flight pursuant to 18 U.S.C. § 3142 (f)(2)(A), the government must demonstrate the defendant's flight risk by a preponderance of the evidence.  *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

The United States seeking detention pursuant to, *inter alia*, 18 U.S.C. § 3142(e)(3)(C), which provides a rebuttable presumption of detention if there is probable cause to believe that the defendant committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." That rebuttable presumption applies to Defendant because 18 U.S.C. § 1361 is specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B) and carries a maximum sentence of ten years in prison. The Grand Jury found probable cause to believe that the defendant committed a felony violation of 18 U.S.C. § 1361.

Once a rebuttable presumption is created, it imposes a burden of production on the defendant to offer contrary credible evidence. *See United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). However, "[t]he presumption is not erased when a defendant proffers evidence

to rebut it; rather the presumption 'remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to the factors listed in § 3142(g)." *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008), (quoting *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986)); *see also United States v. Ali*, 793 F. Supp.2d 386, 387-88 (D.D.C. 2011); *United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) ("[The presumption] is incorporated into the § 3142(g) factors considered by the court when determining whether conditions of release can be fashioned or whether the defendant must be detained pretrial.").

The United States also seeks detention pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A).

## No Condition or Combination of Conditions Will Reasonably Assure the Community Safety or the Defendant's Appearance in Court

**1.  Nature and Circumstances of the Offenses Charged**

The circumstances of the offenses charged in this case overwhelmingly support detention. The defendant is charged by indictment with multiple gravely serious crimes that occurred during an attempt to occupy the Capitol to prevent Congress from carrying out its duty of certifying the Electoral College results.  Among the things the Court is statutorily required to consider is whether the defendant is charged with any crimes of violence or terrorism.  18 U.S.C. § 3142(g)(1).  He is charged with both.  Additionally, because § 1361 is listed in § 2332b(g)(5)(B), there is a rebuttable presumption that no conditions or combination of conditions can assure community safety or the defendant's appearance.  *See* 18 U.S.C. § 3142(e)(3)(B).

   a.   Defendant Committed a Federal Crime of Terrorism and Two Crimes of Violence.

Felony destruction of property, under the facts as laid out above, is a federal crime of terrorism.  Title 18, U.S.C., Section 2332b(g)(5), defines "federal crime of terrorism" as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.  Section 1361 is included in its enumerated list of statutes.

16

*See* 18 U.S.C. §§ 2332b(g)(5)(A) & (B).  The Grand Jury found probable cause in Count Two of the Indictment to believe that the defendant intended to obstruct an official proceeding by "entering the Capitol grounds and Capitol building to, and did, stop, delay, and hinder Congress's certification of the Electoral College vote," in violation of § 1361.  The Grand Jury additionally found probable cause in Count One to believe that the defendant joined a conspiracy whose purpose was to "stop, delay, or hinder Congress's certification of the Electoral College vote, by force if necessary."

Felony destruction of government property is also a crime of violence.  For purposes of the bail statute, as relevant to these offenses, a crime of violence is defined as "an offense that has an element of the use, attempted use, or threatened use of physical force against the person or property of another," if that crime is punishable by ten years or more in prison.  *See* 18 U.S.C. § 3142(f)(1)(A) & 16.  Section 1361 of Title 18 of the U.S. Code meets those requirements.  It is punishable by ten years if the property damage was greater than $1,000, and its elements include the use of physical force against the property of another.  *See United States v. Khatallah*, 316 F. Supp. 2d 207, 213 (D.D.C. 2018) (Cooper, J.) (holding that destruction of government property under a substantially similar statute, 18 U.S.C. § 1363, satisfies a substantially similar elements-clause statute to qualify as a crime of violence).

As the D.C. Circuit has recognized, Greene's acts of being one of the first across breached barricades after they were toppled, and in conspiring with and aiding and abetting those who broke through the Capitol windows put him "in a different category of dangerousness than those who

cheered on the violence or entered the Capitol after others had cleared the way." *See United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).[12]

b.   The Charges and Defendant's Actions Are Serious.

The charges in the indictment are properly characterized as serious due to the possible statutory penalties and the coordinated and determined nature of the defendant's conduct on January 6. Greene was one of the first people to lead the charge from the public area outside the Capitol grounds to the exterior of the building, and he was on the front lines of a multitude of people who ultimately overwhelmed USCP's defenses. After the barricades blocking access from the plaza were breached, Greene was among the first of thousands to flood the plaza outside the Capitol, and he initially positioned himself near the front line of police in riot gear. After Pezzola had stolen a riot shield, Greene trailed him across the West Plaza and ultimately up the stairs, aiding in the crowd's efforts to defeat law enforcement's defenses.

Although there is currently photographic or video evidence that Greene entered the Capitol, he later told an acquaintance that "we took the capital." This statement shows that he identified with and claimed ownership of the occupation of the building, and that he acted in concert with others. Greene took an active role at the front of a mob that displaced Congress, in an attempt to stop the peaceful transition of power. As this Court has noted with Greene's co-defendant, among others, the peaceful transition of power is one of the "crown jewels" of our democracy. *See United States v. Pezzola*, ECF No. 25 at 15. *See also United States v. Meggs*, No. 5:21-mj-1036-PRL

---

[12]     The defendant's contention that he must be released because some defendants charged with assaulting federal officers are released is misplaced. *See* Mot. at 8-9. The Court must decide this motion based on the evidence before it, not the evidence before other courts in other cases. In any event, cases where single defendants are charged with assaulting officers is not an apples-to-apples comparison with this case, involving a defendant charged with conspiracy and ample evidence of both intent and capability to use violence to meet his political ends post-January 6.

(S.D. Fla.) (Lammens, M.J.), ECF No. 17, at 4 ("The [January 6] attack wasn't just one on an entire branch of our government (including a member of the executive branch), but it was an attack on the very foundation of our democracy.")

The defendant claims he committed no violent acts that day. Assuming *arguendo* that assertion to be true, the defendant was present for, and directly benefitted from, several other assaults (in the colloquial sense of the term) on federal officers. He was able to be one of the first individuals past the toppled First Street barriers because those he was with assaulted and trampled USCP officers. He was one of the first to the plaza to the west of the Capitol because others he was with assaulted USCP officers controlling access to that plaza, and he used that violence to his advantage rather than retreating. He continued to travel in tandem with co-defendant Pezzola after the latter took a police riot shield by force and violence. Greene ascended the stairs when he did because he again took advantage of other rioters' actions in overtaking a USCP-manned barrier by force. The defendant would not have had a chance to gloat to his acquaintance about having taken the Capitol, had he not taken advantage of the very real violence committed before his eyes by other rioters on January 6.

## 2. The Weight of Evidence Against the Defendant

The Court must also consider the weight of the evidence in assessing the risk of flight and community danger. 18 U.S.C. § 3142(g)(2). The weight of the evidence against the defendant is substantial; indeed, he concedes his that there is "clear" evidence that he entered a restricted area outside the building. Mot. at 5. This concession is wise, as the defendant's face—albeit often partially covered—is clearly visible in numerous videos, which show him methodically moving towards the Capitol building, at least until he turned back on the stairs, as well as the acts of

violence against both law enforcement officers in the line of duty and U.S. Capitol property that took place around him.[13]

### 3. The History and Characteristics of the Defendant

The defendant's history and characteristics likewise support pretrial detention. The defendant has no criminal convictions of which the government is aware, and his service to the United States in the Army National Guard is commendable. However, as detailed above, after January 6, the defendant was willing to put lessons learned in that military service to use against the United States. He encouraged an associate to read up on guerrilla warfare and to use the tactics used by the Taliban and to "be prepared to do uncomfortable things."[14] He advised others who might be worried about FBI surveillance about how to run surveillance detection routes. He spoke of a "4th-generation" war when a cohort said he was ready to stand strong, but that they needed an army to join. In short, based on the defendant's encrypted messaging after January 6, he showed a willingness and a desire to continue to use force to achieve his political ends. After noting that

---

[13]    The defendant claims, Mot. at 5, that the government's theory of liability as to his violation of 18 U.S.C. § 1361 is "questionable." This indictment, however, unambiguously establishes probable cause to believe that the defendant violated § 1361. *See, e.g.*, *United States v. King*, 842 F.2d 768, 776 (D.C. Cir. 1973) (return of an indictment "makes conclusive the existence of probable cause to hold the accused for further prosecution"). In any event, aiding and abetting is not the only theory of liability through which the defendant can be held liable for co-defendant Pezzola's actions. Co-conspirator liability exists where a substantive offense is committed "in furtherance of the conspiracy and reasonably foreseeable as a necessary or natural consequence of the unlawful agreement." *United States v. Moore*, 651 F.3d 30, 94 (D.C. Cir. 2011) (citing *United States v. Washington*, 106 F.3d 983, 1011 (D.C. Cir. 1997). Destruction of a Capitol window is a foreseeable outcome of the charged conspiracy, which contemplated interfering with the Electoral Vote count, by force if necessary.

[14]    The defendant claims that his messages against regarding using the Taliban's tactics were general statements regarding readiness and not a call to action. Even if true, this should give the Court little comfort, especially because this message came on the heels of a complaint that there was a "fucking rat" in his ranks and a statement that "everyone wants to be a patriot until it's time to do patriot shit."

then-President Trump "threw us all under the bus," he said to the Central New York Proud Boys chat, "the sooner everyone wakes up that no one is going to fix this mess besides us the sooner we can collectively take back our country."

The defendant's lack of a criminal record and gainful employment prior to January 6 must be weighed next to the strength of the government's evidence that he committed these offenses, along with the gravity of those offenses as discussed above.  The crimes the defendant committed on January 6, as noted above, include a crime classified by Congress as a federal crime of terrorism. Congress has moreover prescribed a rebuttable presumption in favor of detention, and the D.C. Circuit has made clear that "conspiring with and aiding and abetting those who broke through the Capitol windows" puts a defendant "in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others had cleared the way."  *See Munchel*, 991 F.3d at 1284 (D.C. Cir. 2021)

### 4. The Nature and Seriousness of the Danger to Any Person or the Community

The defendant's conduct on January 6 demonstrates his dangerousness, as discussed above. Additional evidence of Greene's danger to the community exist in his post-January 6 conduct and statements.  According to W-1, in reference to January 20, the defendant said, "we'll kill them all" and made reference to a stockpile of guns and ammunition.  The telegram messages laid out above corroborate the defendant's desire to engage in warfare against those he considers to be his political enemies.  The FBI's search of the defendant's residence corroborates his access to a stockpile of guns and ammunition, including those he possessed illegally under New York law.  He had eight fully loaded 30-round magazines for his AR-15 stuffed into a tactical vest.  This configuration is hardly what the Court should expect if the defendant purchased the ammunition solely to go to the range.  *See* Mot. at 7.  He purchased six of those magazines just weeks before January 6.  He

purchased 2,560 rounds of ammunition—1,000 for the AR-15 and 1,560 for an AK-47-type weapon—just three days after the riot at the Capitol.  Two days after that, he purchased a gas mask.  In combination with the defendant's statements as detailed above referencing war and Taliban tactics, this purchase and its timing should give the Court pause.[15]

The defendant has made it clear that he is willing to play a front-line role in a violent revolt to attempt to stop the certification of an election if he believes—despite absence of evidence to support those beliefs—that doing so will protect the country.  The Court can have no confidence that the defendant will not take similar actions in the future if he feels they are justified, and indeed the defendant's statements and actions in the wake of the January 6 attack demonstrate that he was not only willing to take those actions, but he encouraged others to be willing as well, and he took proactive steps to be ready to take those actions himself, including purchasing a stockpile of assault-rifle ammunition and a gas mask.

The defendant showed perseverance, determination, and coordination in being at the front lines every step along the way of the riot that led to the physical takeover of the Capitol by his co-conspirators and others.  Given the combination of the defendant's actions on that day, his professed intentions to commit additional violence, and his access to the means to carry out that violence, and in light of the offenses with which the defendant is charged and the presumption in

---

[15]     The defendant also claims that the purchase of the AK-47 ammunition was a mistake. Mot. at 7.  According to the receipt, the defendant paid $624.49 for this ammunition.  He has made no representation, either to the Court or the government, that he attempted to return this ammunition as a result of his "mistake."  Even if this purchase was truly a mistake, the defendant's explanation to this Court is of little comfort, as he claims to have meant to purchase AR-15 ammunition.  No matter how the Court slices it, it is undisputed that the defendant intended to purchase over 2,500 rounds of assault-rifle ammunition on January 9, 2021.

favor of detention, there are simply no conditions nor combinations of conditions of release that can assure the safety of the community or the defendant's return to court if he is released.

### Conclusion

Under the factors set forth in 18 U.S.C. § 3142(g), the government has demonstrated by a clear and convincing evidence that the defendant is a danger to the community and by preponderance of the evidence that he is a flight risk.  For the foregoing reasons, as well as those that the government will demonstrate at any hearing on this matter, the government requests that the Court order the pre-trial detention of the defendant.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY
DC Bar No. 415793


By:  __/s/ *Erik M. Kenerson*_
ERIK M. KENERSON
Assistant United States Attorney
Ohio Bar Number 82960
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: 202-252-7201
Email: Erik.Kenerson@usdoj.gov